UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x

| | |
|---|---|
| SHLOMO YEHUDA RECHNITZ, | Docket No. 20-cv-1607 (KAM)(VMS) |
| Plaintiff, | **DECLARATION OF EPHRAIM KUTNER** |
| -against- | |
| EPHRAIM KUTNER, JONATHAN KUTNER and GREYSTONE FUNDING CORP., | |
| Defendants. | |

---------------------------------------------------------------------x

GREYSTONE FUNDING CORP.,

       Counterclaimant/Cross-Claimant and Third-Party Plaintiff,

    -against-

SHLOMO YEHUDA RECHNITZ,

       Counterclaim Defendant,

    -and-

EPHRAIM KUTNER and JONATHAN KUTNER,

       Cross-Claim Defendants,

    -and-

HARBORVIEW CAPITAL PARTNERS, LLC and CLARITY CAPITAL PARTNERS LLC,

       Third-Party Defendants.

---------------------------------------------------------------------x

EPHRAIM KUTNER, declares under the penalty of perjury the following to be true and correct pursuant to 28 USC § 1746:

1.    I am an individual defendant in this matter.

2.    I submit this declaration in opposition to (i) plaintiff's application to confirm an arbitration award dated March 11, 2020, issued by Rabbi Dovid Cohen

and plaintiff's motion for an order to attachment and (ii) in support of my and Jonathan Kutner's cross-motion to vacate the arbitration award and vacate the *ex parte* order of attachment.

*Background of Kutner-Rechnitz Relationship*

3. I have known petitioner-plaintiff, Shlomo Rechnitz, for at least fifteen years. I first met him while I was working as a loan originator for Greystone Funding Corporation – an approved HUD lender.

4. I worked with Rechnitz to secure financing that facilitated Rechnitz's purchase of his first nursing home.

5. Over the years, we helped Rechnitz secure nearly $1 billion in bank and HUD financing to acquire nursing homes throughout the State of California. Our relationship expanded over time to include more than just loans. Indeed, Rechnitz played an instrumental role in my decision to leave Greystone and ultimately sue the company for commissions I was owed.

*Rechnitz and I Enter Into a Joint Venture to Fund the Greystone Lawsuit*

6. Rechnitz invested in my lawsuit against Greystone that was pending in the Supreme Court of the State of New York, *Kutner v. Greystone Funding Corporation*, Index No. 652210/2013.

7. The terms of that investment were reduced to writing. On December 24, 2014, Grove-Let, LLC, and entity controlled by Rechnitz, and I entered into a Strategic Legal Partners Joint Venture Agreement. (Exh. A) The stated purpose of

2

the venture was to "conduct certain business activities, including but not limited to lawsuit funding" and activities incidental thereto.

8. Between January 1, 2013 and December 22, 2014, the parties to the venture agreement were me and Grove-Let; however, beginning on December 24, 2014, I was replaced by an entity I controlled, Strategic Legal Partners, LLC.

9. Rechnitz signed the agreement only as managing member of Grove-Let, and I signed twice: in my individual capacity and as manager of Strategic Legal Partners.

10. Under the agreement, Grove-Let was required to "facilitate and/or make capital contributions to the Venture of cash in amounts sufficient to meet the ongoing legal fees of the Venture . . . on a capital call basis as directed by the Manager." (Exh. A, Section 2(A)(a)). I was the only manager of the venture. (*Id.* at § 3).

11. My contribution to the venture was all of my "right, title and interest to that certain cause of action against Greystone Funding Corporation." (*Id.* at § 2(A)(b)).

12. Provided Rechnitz honored his obligation to fund the lawsuit as I requested, profits from the venture were to be distributed "first to Grove in an amount equal to the Expenses, and thereafter, 30% to Grove and 70% to [Kutner]". (*Id.* at § 2(C)).

13. The venture agreement states that it shall only be modified in a writing signed by the party to be bound. (*Id.* at § 14(c)).

*Rechnitz Invests in My Mezzanine Lending Business*

14. Upon leaving Greystone, I started my own businesses with my brother Jonathan: Harborview Capital Partners, which served as a consultant for clients seeking to obtain bridge and HUD financing, and Harborview Capital Funding, which served as a mezzanine lender. Rechnitz loaned me and the consulting business money to get started,[1] and he also provided the capital for the mezzanine loans.

15. For the mezzanine loans, we would send a summary of the proposed borrower's business and qualifications and the loan terms to Rechnitz for his review. If he approved the terms of the deal, Rechnitz would fund the loan. Harborview Capital would earn an origination fee at closing and thereafter collect all interest payments and the balloon payment for the principal. Harborview Capital would then forward the principal to Rechnitz.

16. Rechnitz is fond of publicly stating that he does not charge interest for loans he makes. But he does earn a return in other ways. His "fee" for providing the loan was one half of the consulting fee Harborview Capital earned once the mezzanine loan was replaced with HUD financing. Harborview Capital would keep the other half of the consulting fee along with the interest on the loan (less amounts owed to other loan participants).

17. This agreement was never reduced to writing.

---

[1] These loans have since been re-paid in full.

4

18. In total, Rechnitz funded eight loans, totaling $11.5 million in principal. Today, $3.9 million of those loans have been repaid to Rechnitz, and the remainder are either not yet due or are in default.

*Rechnitz Attempts to Extort Me for Millions of Dollars*

19. In the fall of 2017, Harborview's consulting business, Harborview Capital Partners, closed on an approximately $200 million portfolio of Rechnitz's nursing homes.

20. Rechnitz's chief financial officer, David Weldler, told me that Rechnitz "went beserk" and "off the deep end" when he learned how much Harborview Capital Partners earned on that transaction.

21. Rechnitz thereafter demanded that we kick back a portion of the fee we earned on the transaction to him – which is prohibited by HUD guidelines.

22. When I refused to give him a prohibited kickback, Rechnitz sent me an email on February 25, 2018, threatening to tell everyone "who fucked who" and promising to do "EVERYTHING in [his] power, within [his] legal rights, to expose who [I am] to not only every person [he knew], but also to everybody who [knew him]" unless I capitulated to his various demands, which included repaying him immediately all the money he had loaned me and my businesses. Rechnitz promised that "[w]hatever the fall out will be (and it will be fast)" from his campaign against me "will put [me] right back in the gutter with the shitty name and reputation you deserve. I will not let you out of my mind every morning till I feel that everyone knows who you are." Rechnitz concludes his email by stating

5

"[y]ou're the first person ever to take me over the barrel, and boy are you going to feel it." (Exh. B)

23.  I was taken aback by Rechnitz's email because Jewish law (as well as New York and federal law) prohibits Jews from blackmailing each other.

24.  My brother and I raised this email with Rabbi Cohen, who knew Rechnitz's father. Rabbi Cohen told us to bring Rechnitz to him so that he could chastise him for attempting to extort us.

*The Arbitration Agreement*

25.  That is why my brother and I appeared before Rabbi Cohen on August 14, 2018. We met in the dining room of the Rabbi's house in Brooklyn. My brother and I were there alone; however, Rechnitz appeared with his chief financial officer, David Weldler. We were not aware that Mr. Weldler would be attending, and certainly had no reason to expect his presence given our understanding of the limited purpose of the meeting. We therefore objected to Weldler's presence, but Rechnitz insisted that he remain.

26.  As the meeting unfolded, Weldler raised the mezzanine lending business with the Rabbi. Apparently, Rechnitz was no longer satisfied with the terms we had agreed to and now wanted to own half of the company. As a 50% owner, Rechnitz would share in the origination fee and interest earned by Harborview Capital in addition to the consulting fee.

6

27. My brother and I objected to Rechnitz changing the terms of our agreement and seeking to gain an ownership interest in the mezzanine lending business.

28. Rechnitz insisted that Rabbi Cohen arbitrate his entitlement to an ownership interest in the mezzanine lending business, Harborview Capital Funding.

29. My brother and I were presented with a handwritten document to sign obligating us to arbitrate before Rabbi Cohen. That agreement is dated August 14, 2018, and is attached as Exhibit 2 to the petition-complaint.

30. That agreement states that "Rechnitz . . . on his own, and as a partner in Harborview Capital LLC and Jonathan and Ephraim Kutner . . . on their own, and as partners in the above company, have come to me to adjudicate *a dispute*. They have agreed to accept my decision." (emphasis added).

31. During the meeting in Rabbi Cohen's dining room, Weldler read some figures off the documents that he had brought with him, but no documents were provided to Rabbi Cohen to review.

32. We were admittedly unprepared for this discussion, as we did not know when we appeared on August 14 that the mezzanine lending business would be presented to Rabbi Cohen that day. The only topic we thought was being discussed was Rechnitz's blackmail email.

33. At the conclusion, Rabbi Cohen ruled that the mezzanine loans should be repaid by the borrowers directly to Rechnitz and that we should provide Victor

7

(Yaakov) Lupnitzky, a forensic accountant, with all of the books and records of the mezzanine lending business.

34. Following the August 14 meeting, we instructed our Rabbi, Yochanan Bechhofer, to request additional hearing dates so that we could present all of our evidence and fly in witnesses to give testimony. (Petition/Complaint – Exh. 3).

35. In response, Rabbi Cohen wrote that he had "already assured the Kutners that we shall all get together before a final decision is rendered." (Petition/Complaint – Exh. 4). But that is not what happened at all. No additional hearings were ever held. We were never given an opportunity to present documentary evidence or present witnesses before Rabbi Cohen issued his ruling on November 5, 2018.

*All Subsequent Correspondence with Rabbi Cohen*
*Focused on the Mezzanine Lending Business*

36. In the days and weeks following the August 14 meeting, all correspondence from Rechnitz to Rabbi Cohen focused only on the mezzanine loans that were discussed with Rabbi Cohen. For example, on August 20, just two days after appearing before Rabbi Cohen, Weldler requested a modification of the Rabbi's "pesak," which directed the Kutners to instruct the mezzanine borrowers to repay the loans directly to a Rechnitz entity, to also include a prohibition preventing the Kutners from sending a subsequent letter altering or withdrawing that direction. (Exh. C)

37. On October 4, 2018, Weldler again wrote to Rabbi Cohen on behalf of Rechnitz as follows: "In as much as we have heard nothing from Efraim Kutner

8

with regard to the PSAK of Rabbi Cohen, as it related to: 1) drafting and executing documents instructing the mezzanine borrowers to repay the outstanding loans, when due, directly to a Rechnitz owned entity[,] 2) providing financial statements[,] 3) providing information to the forensic accountant (to the best of my knowledge this has not been done)[.]  Please suggest the next steps we should take to enforce the existing PSAK.  It has been suggested that we hire an attorney to present the binding arbitration ruling to a court for enforcement." (Exh. D)

38. A few weeks later, Weldler again wrote to Rabbi Cohen on behalf of Rechnitz and requested that the Rabbi "issue a final written award concerning the dispute between Mr. Rechnitz and Ephraim and Jonathan Kutner relating to certain mezzanine loans that Mr. Rechnitz funded ("Mezzanine Loans")." (Exh. E) In this correspondence, Weldler summarized the events of the August 14, 2018 arbitration as follows: "the Rav ruled, among other things, that the Kutners and the entities they control must direct the Mezzanine Loans borrowers to make payments directly to Mr. Rechnitz, with the interest payments to be held in escrow until Mr. Rechnitz is repaid in full, and to inform the Mezzanine Loans borrowers that Mr. Rechnitz or his agent is authorized to act on behalf of the lender of the Mezzanine Loans." Weldler included with that email a proposed arbitration award for Rabbi Cohen to execute. (Exh. F)

39. Weldler subsequently sent a revised proposed award on October 29, 2018. (Exh. G)

9

40. In response to that second proposed order, we objected to the issuance of any order without a new hearing date at which they could present witnesses and documentary evidence – just as Rabbi Cohen "assured" us would happen. (Exh. H)

41. But Rechnitz objected to any continued hearing. In another correspondence from Weldler on November 1, 2018, Rechnitz claimed that "Rabbi Cohen already heard testimony and ruled based upon the testimony that was presented at the hearing that Mr. Rechnitz is owed $8,967,750, which represented the principal balance of the mezzanine loans at the time of the hearing." (Exh. I).[2]

42. On November 5, 2018, Rabbi Cohen issued his written decision on the mezzanine loan dispute, without ever reconvening the parties and accepting additional evidence from us as he promised he would. (Exh. J).

43. This decision was nearly a verbatim duplicate of the proposed order sent by Rechnitz. The only changes were a misspelling of Kutner's name on page 1 and the addition of a notary block. Substantively, the Rabbi adopted in whole cloth the conclusions advanced by Rechnitz. (*Compare* Exh. G to Exh. J).

44. In the order, Rabbi Cohen ruled that all principal and interest payments should be paid by the borrowers directly into accounts controlled by Rechnitz.

45. While the order concludes that Rabbi Cohen retains jurisdiction "concerning the other business disputes between the parties," it does not identify what those other disputes were or related to.

---

[2] We do not agree with this description of Rabbi Cohen's ruling on August 14.

46. But we never agreed to arbitrate multiple disputes with Rechnitz. The arbitration agreement is very clear that that the parties agreed to arbitrate a single "dispute" – not disputes as Rechnitz now claims.

47. The only dispute that we agreed to arbitrate on August 14, 2018, related to the mezzanine lending business, and Rabbi Cohen issued his decision on that dispute in the November 5 award.

### The Greystone Lawsuit Settled

48. In May 2019, I finally settled the lawsuit against Greystone after nearly six years of litigating.

49. The terms of that settlement are confidential.

50. Rechnitz was intimately involved in the settlement negotiations. He came to New York on April 11, 2019, to attend a meeting we had with Steve Rosenberg, the principal owner of Greystone. Rechnitz led the negotiations.

51. The only reason we agreed to the settlement sum obtained by Rechnitz is because he had agreed to amend the joint venture agreement and limit his share of the proceeds to a flat fee of $3 million.

52. My brother and I made clear to Rechnitz that we did not have $3 million available to pay Rechnitz in one lump sum, so his share necessarily had to come out of the settlement installment payments that Rechnitz himself proposed.

53. In July 2019, Weldler sent us a proposed settlement agreement in which he proposed that all monthly payments be first allocated to Rechnitz's $3

11

million worth of principal and subsequent payments split one-third to Rechnitz and two-thirds to me and Jonathan. (Exh. K)

54. This proposed settlement also addressed ongoing aspects of the mezzanine lending business.

55. But this proposal was never accepted or finalized.

*Rechnitz Demands that Rabbi Cohen Rule on the Greystone Litigation Investment*

56. On February 27, 2020, Rechnitz, writing through his representative Weldler, requested that Rabbi Cohen reconvene the parties to pass on all remaining issues that he had been asked to arbitrate. (Exh. L). Weldler attached to that email a list of the supposed items that he claimed had been provided to Rabbi Cohen at the start of the arbitration, which included the Greystone litigation investment.

57. I had never seen this list before Weldler's February 27 email.

58. The document itself proves that it could not have been given to Rabbi Cohen at the start of the proceedings on August 14 as Weldler claimed. The document information shows that it was created on August 20, 2018 – six days after the arbitration agreement was signed. (*See* Exh. M (a copy of the email and attachment in native format will be provided to the Court upon request)).

59. Nevertheless, on February 20, 2020, Rabbi Cohen directed the parties to appear before him "to complete the arbitration" on March 1, 2020, at 4:00 p.m. (Exh. N).

12

60. We objected to the hearing before Rabbi Cohen, as we had not agreed to arbitrate any dispute other than the mezzanine loans before him and in our opinion we had no disputes with Rechnitz at the time because we had previously resolved all of our issues. Nor would we have agreed at that time to arbitrate anything else before him after he failed to schedule the continued hearing on the mezzanine loans as promised and adopted Rechnitz's proposed arbitration award without a single substantive alteration.

61. On March 9, Weldler again wrote to Rabbi Cohen requesting that the Rabbi issue yet another written award concerning the mezzanine loan dispute as well as the proceeds from the Greystone settlement. (Exh. O) Once again, Weldler provided a draft arbitration award Rechnitz wanted the Rabbi to sign. (Exh. P)

62. And just as in the past, Rabbi Cohen signed that order in whole cloth on March 11, without any further hearing or evidence. (*Compare* Exh. P to Exh. 1 to the Petition/Complaint) Incredibly, Rabbi Cohen issued this ruling without ever hearing from the parties on the issue of the Greystone litigation venture.

63. This order too purports to reserve jurisdiction to Rabbi Cohen over the parties' other, unspecified business disputes.

64. I did not receive this March 11 award until it was attached as an exhibit to Rechnitz's motion to confirm. That was the first time I saw the award.

65. The certified mail receipts attached as Exhibit 1 to the petition-complaint do not relate to the March 2020 arbitration award. Tracking the numbers on the certified mail receipts addressed to the Kutners using the United

13

States Postal Service's tracking function, available at

https://tools.usps.com/go/TrackConfirmAction_input, reveals that the packages were all delivered on November 8, 2018, making it impossible to be the receipts for the March 2020 award. (Exh. Q)

*The Greystone Litigation Investment Could Not Have*
*Been Part of the August 2018 Arbitration with Rabbi Cohen*

66. I feel that Rechnitz is deliberately attempting to exploit the lack of specificity in the arbitration agreement and the catchall retention of jurisdiction provisions (which I understand are not enforceable against me in the absence of a clear agreement to arbitrate) contained in the orders that he drafts in order to obtain quick and favorable decisions in any dispute that may ever arise between us, simply by claiming that the issue "was discussed" on August 14.

67. Rechnitz now attempts to confirm that March 11 arbitration award, and in doing so argues that his investment in the Greystone litigation was part of the August 14 arbitration.

68. That was simply not the case – as the correspondence above shows.

69. Indeed, it was temporarily impossible for the Greystone litigation investment to have been the subject of the arbitration because there was no dispute between me and Rechnitz concerning the litigation in August of 2018 when the arbitration agreement was signed. Notably, Rechnitz never identifies the nature of the dispute that was supposedly submitted to Rabbi Cohen.

70. In August of 2018, the Greystone case was nowhere near resolution. Document discovery was ongoing; not a single deposition had been conducted.

14

Rather, the parties were deeply involved in a dispute concerning the scope of document production, which led Justice Ramos to schedule an evidentiary hearing to resolve that issue. That hearing was originally to take place in October 2018 but was eventually pushed back to December 2018. In August, there were no settlement discussions taking place between the parties, and the case was far from resolution.

71. Rechnitz oftentimes expressed his frustration over the pace of the case, given that pursuant to the terms of the venture agreement, he was only to be repaid once the case concluded and only if we were successful, but the speed of the case was not a dispute capable of being resolved by Rabbi Cohen.

72. We did not begin having settlement discussions with Greystone until the evidentiary hearing in December 2018 – four months after the arbitration agreement was signed. Those discussions fizzled because Greystone kept low-balling us.

73. The Greystone case did not settle until May 2019.

74. The dispute over the Greystone settlement did not arise until then, nearly a year after we sat in Rabbi Cohen's living room, making it impossible for the dispute to have been given to Rabbi Cohen in August 2018.

*Rechnitz's Share, If Any, of the Greystone Settlement is Uncertain*

75. Rechnitz claims in his motion to confirm the order of attachment that I represented to him that we did not have money to repay him, that we were in poor

financial condition and struggling and that we did not intend to pay him are absolutely false.

77. 76. I never refused to pay Rechnitz altogether. While I did say that I did not have the $3 million available to pay him in one lump sum, I always proposed that we share each installment payment until Rechnitz received his $3 million.

77. As recently as March 2020, I wrote to Rechnitz and told him that I had been trying to reach Greystone to make arrangements so that one-half of each settlement payment would go directly to an account designated by Rechnitz. (Exh. R)

78. On March 3, I reported to Rechnitz that Greystone agreed and asked him to provide wiring instructions for the account he would accept the deposits into. (Exh. S)

79. But Weldler simply responded that Rechnitz does not agree to this. (Exh. T) Six days later, Weldler requested that Rabbi Cohen issue the second arbitration award.

80. I remain willing to pay Rechnitz what he is owed, but that amount is far from certain because Rechnitz breached the terms of the joint venture agreement. Rechnitz failed to fund litigation expenses, as required by the venture agreement and as I requested as manager of the venture.

81. After I switched counsel from Dechert LLP to Abrams Fensterman, Dechert was owed a substantial balance. In order to secure the transition of the file to my new counsel, Rechnitz negotiated a settlement with Dechert in November

16

2016; whereby, the sum of $276,102 was to be paid over time to satisfy the outstanding invoices.

82. I was not involved in the negotations of this settlement agreement; although, I remained liable for the amounts owed.

83. In June 2018, Rechnitz stopped paying Dechert, leaving me on the hook to personally fund the remainder of the payments. Furthermore, other than the initial retainer to Abrams Fensterman, Rechnitz refused to pay any of that firm's invoices, despite my repeated requests.

84. As a result, Jonathan and I paid $465,000 out of our own funds to pay for the costs of the Greystone litigation.

85. Rechnitz's refusal to pay Dechert and Abrams Fensterman constitute material breaches of the venture agreement.

86. Even if I had agreed to submit a dispute concerning the Greystone litigation investment to Rabbi Cohen, he never conducted a hearing, so I was never afforded an opportunity to present these breaches as an offset to whatever money Rechnitz might be entitled to.

87. But of course I did not agree to arbitrate the Greystone litigation investment. For that reason, the March 2020 arbitration award must be vacated.

88. Once vacated, if Rechnitz and I are unable to work out our differences and litigation ensues, I intend to raise his breaches of the venture agreement as a defense to Rechnitz's claims for any portion of the net recovery or as counterclaims.

*Conclusion*

89. I therefore respectfully ask that the Court deny Rechnitz's motion to confirm the March 11 arbitration award and vacate that award along with the *ex parte* order of attachment. We simply never agreed to arbitrate any dispute concerning the funding of the Greystone lawsuit, so Rabbi Cohen did not have any authority to issue the March 11 award.

I declare under penalty of perjury that the foregoing is true and correct:

_____
EPHRAIM KUTNER

AFFIRMED TO BEFORE ME
THIS 20 DAY OF MAY, 2020

_____
Notary Public

> BARA L DOLINGER
> NOTARY PUBLIC, STATE OF NEW YORK
> Registration No. 01DO6296451
> Qualified in Nassau County
> Commission Expires February 3, 2022

18